Eva B. Painter, Complainant, v. Merchants and Manufacturers Bank of Milwaukee et al., Defendants. Dora Oberheide, Appellant, v. Leo F. Nohl et al., Appellees.

Gen. No. 37,033.

Opinion filed October 16, 1934.

MARKMAN, DONOVAN & SULLIVAN, for appellant; HENRY O. NICKEL and CHARLES E. LOY, of counsel.

HERSHENSON & HERSHENSON, for certain appellees.

CHARLES W. LAMBORN, for certain other appellees.

MR. JUSTICE SULLIVAN delivered the opinion of the court.

This appeal by plaintiff, Dora Oberheide, seeks to reverse a decree of the circuit court approving and confirming the master's report after overruling her exceptions thereto, and dismissing for want of equity her several bills of complaint which had been consolidated. The decree appealed from also vacated and set aside a decree *pro confesso* in plaintiff's behalf entered February 19, 1925, declaring the sheriff of Cook county's certificate of sale of 1/9 interest in the real estate involved null and void and a cloud on her title, and ordered that a certain assignment to plaintiff made by Eva B. Painter (hereinafter referred to as Mrs. Painter), plaintiff in one of the original bills of complaint and superseded as such by Dora Oberheide after the assignment, be declared null and void and the consideration therefor repaid to plaintiff by

Mrs. Painter. The decree found that Leo F. Nohl, defendant and cross plaintiff, held in trust an undivided 1/9 interest in the real estate owned by plaintiff for the Merchants and Manufacturers Bank of Milwaukee to the extent of $1,000, for the heirs of Mrs. Painter to the extent of 60 per cent of the remainder and for himself 40 per cent of the remainder; and the decree ordered a partition of the property. Mrs. Painter died May 12, 1932, and her heirs were substituted for her as parties to this proceeding.

For a clearer understanding of the issues presented on this appeal it is necessary to detail the facts and events concerning and leading up to this litigation.

The following facts are either undisputed or appear clearly from the evidence. On or about November 11, 1917, Mrs. Painter made loans, evidenced by several notes aggregating $5,500, from the First National Bank of Milwaukee (hereinafter referred to as the First National Bank). November 2, 1917, she negotiated a loan of $5,000 from the Merchants and Manufacturers Bank of Milwaukee (hereinafter referred to either as the Merchants Bank or the Bank), and as security for both loans gave a deed in fee simple to certain Milwaukee property owned by her to the First Savings and Trust Company of Milwaukee (hereinafter referred to as the Trust Company). An agreement was entered into November 11, 1917, between Mrs. Painter, the two banks and the Trust Company, reciting that notes had been given by her to the First National Bank and the Merchants Bank for $5,500 and $5,000, respectively, evidencing her indebtedness to the banks; that her $5,000 indebtedness to the Merchants Bank secured by her deed and her note for that amount was also secured by a note of C. H. Oberheide (son of plaintiff) for $2,500, payable to Mrs. Painter and due September 15, 1913, which note was pledged as additional collateral for this loan. The agreement provided that Mrs. Painter's property was conveyed

to the Trust Company to secure the payment of her indebtedness to both banks; and also, in effect, that if there was no default in the payment of the total indebtedness owing to the two banks, including interest, the property was to be reconveyed to her, and that if there was default in the payment of either the principal of the notes or the interest thereon, the Trust Company would have full control of the property, either to manage or sell it.

July 20, 1921, the Merchants Bank sold, assigned and conveyed to certain individuals as trustees for the stockholders of the First National Bank, its entire interest in the deed to the Trust Company executed by Mrs. Painter November 11, 1919, along with the agreement of that date, and her note of November 2, 1917, for $5,000, as well as its right, title and interest in and to the judgment of foreclosure of April 24, 1920, which foreclosed the aforesaid deed and agreement as a mortgage in an action entitled *First Trust Company v. Eva B. Painter.* As a result of this foreclosure proceeding Mrs. Painter's property was sold by the sheriff of Milwaukee county, Wisconsin, sometime prior to July 19, 1921, for an amount not disclosed by the record, but which was more than sufficient to pay her principal notes originally issued to both banks amounting to $10,500, together with the interest thereon and the costs of the foreclosure proceeding. In fact there was a surplus of $467.11 from the foreclosure plus $187.16 unexpired insurance premium on the foreclosed property, which was remitted to Mrs. Painter's attorney. Plaintiff's exhibit 3, which is a certified copy of the foreclosure proceeding, *First Trust Company v. Eva B. Painter,* in the circuit court of Milwaukee county, Wisconsin, does not disclose the exact date of sale, but does disclose that Patrick McManus, the sheriff of that county, presented and filed July 19, 1921, his report of the sale of the Painter property, and it was confirmed and approved by the circuit court August 6,

1921. October 12, 1921, all of her notes which had been held by both banks were returned to Mrs. Painter except the C. H. Oberheide note for $2,500, which had been given to the Merchants Bank as additional collateral security for her $5,000 principal note.

August 20, 1919, after default in the payment of principal and interest on the $5,000 note then held by the Merchants Bank, it confessed judgment in its own name in the circuit court at Milwaukee against C. H. Oberheide for $3,289.57 and $8.20 costs on his $2,500 note. Thereafter, July 17, 1920, the Merchants Bank filed suit on that judgment in the circuit court of Cook county and recovered a judgment against C. H. Oberheide for $3,294.70 debt, $179.50 damages and $13.35 costs. An execution on this judgment was issued and placed in the hands of the sheriff of Cook county July 20, 1920, and returned by him October 20, 1920, ''no part satisfied.''

May 17, 1922, after several unsuccessful requests, Mrs. Painter wrote a letter to the Merchants Bank demanding that it turn over and assign to her its judgment against C. H. Oberheide, inasmuch as the bank had sold and assigned her principal note of $5,000, for which the Oberheide $2,500 note had been pledged as collateral security. In reply to her written demand Mr. Myers, president of the Merchants Bank, wrote her May 22, 1922, as follows:

''I have your letter of the 17th in regard to the judgment against Oberheide.

''I have not the figures by me just at this moment, but if I remember rightly, the $125.00 which I asked you to pay us for the transfer of the judgment was only a small part of what we had actually paid out and what represented a real loss to the bank.

''I do not feel that we can afford to lose all this money and for that reason, ask you to contribute your share. I do not say that I can do anything better than my offer, but if you wish to send me $100.00 I will put

it up to the Board of Directors and try to get it through.''

Christ Oberheide, husband of plaintiff and father of C. H. Oberheide, died intestate March 11, 1923, and at the time of his death was the owner in fee simple of certain real estate in Cook county, described particularly in the decree. He left surviving him, besides plaintiff and C. H. Oberheide, several other children. March 24, 1923, all of the children joined in a conveyance of their right, title and interest in and to the real estate owned and possessed by their father at the time of his death to their mother, Dora Oberheide, plaintiff. February 4, 1924, an alias execution was issued and placed in the hands of the sheriff of Cook county, who sold C. H. Oberheide's 1/9 interest in the Oberheide real estate to the Merchants Bank March 18, 1924, for $2,500 and issued his certificate of sale therefor. The Merchants Bank assigned this certificate of sale April 23, 1925, to Leo F. Nohl, an officer of the bank and its attorney, to whom the sheriff of Cook county delivered his sheriff's deed June 23, 1925.

In the month of February, 1924, Mrs. Painter and C. H. Oberheide called at the office of Frank L. Hume, an attorney in Chicago, and Mrs. Painter then stated to Mr. Hume that she had borrowed $5,000 from the Merchants Bank and had given her note therefor, and that a $2,500 C. H. Oberheide note, which she held, was pledged by her with the bank as additional collateral security for her $5,000 indebtedness; that the $5,000 note had also been secured by a mortgage on her property in Milwaukee; that the mortgage had been foreclosed and the property sold, realizing more than sufficient to pay the $5,000 principal note originally given by her to the Merchants Bank, as well as the $5,500 notes held by the First National Bank, accrued interest on same, together with all costs and attorney's fees; that subsequent to the date of the foreclosure judgment the Merchants Bank sold and assigned her $5,000

principal note to certain trustees of the stockholders of the First National Bank for $4,000; that she demanded that Mr. Myers, president of the Merchants Bank, return the $2,500 Oberheide note and transfer and assign the judgment thereon to her, but that she had never obtained any satisfaction from him or Leo F. Nohl, the bank's attorney; that subsequent to the foreclosure sale of her property the surplus remaining after the payment of her notes, accrued interest thereon and costs was forwarded to her through her attorney; and that, inasmuch as her $5,500 and $5,000 principal notes had been fully paid, it was her opinion that the judgment which had been rendered on the Oberheide note belonged to her and that the Merchants Bank had no right in law to retain same. Mr. Hume agreed with her.

February 5, 1924, Mrs. Painter signed a letter directed to Mr. Hume stating briefly the history of her transaction with the Merchants Bank in connection with the Oberheide note, which concluded as follows:

"You are authorized to obtain that note back from the bank for me and if necessary have them assign such judgment to me because it was rendered on the note which I actually paid."

Mr. Myers, president of the Merchants Bank, in his letter of May 22, 1922, to Mrs. Painter, admitted that the only claim it or its attorney had in or to the judgment on the Oberheide collateral note of $2,500 was $125 or possibly $100 for its costs and attorney's fees for securing the entry of the judgments in Milwaukee and Cook county on that note. At the time of this admission the original execution had been issued and returned and the only additional legal service performed or additional expenditure incurred in behalf of the Merchants Bank by its officer and attorney, Leo F. Nohl, in connection with the Oberheide judgment, was securing the issuance of an alias execution, which was placed in the hands of the sheriff of Cook county Feb-

ruary 4, 1924, for the purpose of levying on C. H. Oberheide's interest in his father's estate and selling same. We are unable to reconcile the above stated facts with the following letter written to Mrs. Painter by Leo F. Nohl, of the Milwaukee law firm of Nohl, Nohl and Petrie, February 14, 1924:

"You will remember that when you were in our office, we recited to you the detailed facts concerning the entry of the judgment against C. H. Oberheide and the fact that attorneys' fees had been incurred. Pursuant to your understanding with Mr. Myers of the Merchants & Manufacturers Bank, *an arrangement was to be made by which 40% of the proceeds of the collection of the judgment were to be applied to the payment of attorneys' fees so that it would require no further cash disbursements on your part or the bank for the attorney fees.* This arrangement between you and Mr. Myers was restated to you and you confirmed the arrangements and told us to go ahead with the collection of the judgment against Oberheide, and that we should deduct 40% of the proceeds of the collection of the judgment and remit the balance to you. You will remember, moreover, that we figured out how much this balance would be if we succeeded in making the collection. You approved this in every respect and told us you would see Mr. Vennema in Chicago immediately upon your return to that city and personally satisfy him as to these arrangements. Now, if you do not want us to do anything further on the collection of the judgment against Mr. Oberheide and require an assignment of the judgment to you, we should, of course, want these attorneys' fees and disbursements paid to us.

"The judgment now amounts to $4,200.00 in round figures, including interest, costs, and attorneys' fees. Our share of this would be approximately $1,680.00. The cash disbursements, of course, would have to be taken care of separately, but in the course of the figures, they would be a comparatively nominal amount.

If you want the assignment of the judgment to you, the bank would want to protect itself and its liability for these attorneys' fees, and it would be necessary for you to send us or the bank this amount of money. Otherwise, we shall feel justified in going ahead with the collection of the judgment.

"We shall be pleased to hear from you immediately as to whether you want an assignment made to you under these conditions. We should also like to know whether you have made any arrangements with Mr. Oberheide in regard to a settlement of this judgment." (Italics ours.)

It will be observed that this letter of Nohl's of February 14, 1924, did not pretend to state that Mrs. Painter agreed or arranged with the bank to pay Nohl 40 per cent of the proceeds of the Oberheide judgment. He does say "an arrangement was to be made" and asserts that she made that sort of an agreement with him on a claim that his client, the bank, in our opinion, had no valid right to assert and was not asserting, according to the terms of his letter. This letter simply stated that Mrs. Painter had agreed on a 40-60 split of the proceeds of the judgment between Nohl and herself.

As expressive of her attitude at that time, on her right to the assignment of the judgment by the bank to her and on the arrangement for attorney's fees as suggested by Nohl, Mrs. Painter wrote the following letter to C. H. Oberheide, February 15, 1924, inclosing Nohl's letter of February 14, to her:

"Am enclosing this letter received from the bank's attorney and note what he says regarding 40% fees. There is no truth in that at all, for in the first place Mr. Myers told me they took the collection of their fees on their basis as the bank claimed they wouldn't pay the expenses of the judgment and they can't get away with any of these stories. I insist upon that note and judgment transferred to me and no matter what they

try to say I said as I said nothing to that effect at all. Now you let me know how you answered this letter as you advised me not to write them at all and will leave the matter entirely to you. They don't need to think they're going to get away with it as easy as that. Note and judgment belongs to me. I paid that note and I can prove it by my papers. Trusting to hear from you on the above at once, with kind regards.

"P. S. They don't want much, those lawyers, do they. You send me a copy of the letter you write them in answer to them."

Then this letter was written by Mrs. Painter to C. H. Oberheide, February 16, 1924:

"Just received this other letter from the Milwaukee attorney. Tried to get you by long distance this afternoon but couldn't reach you. What do they mean by saying the bank will hold me for $1,000? Fees for that judgment at the time they got it was a little over $100.00.

"I don't owe the bank one cent and they will never get another dollar out of me, and you can rest assured they are going to come around with that note. Let me know at once how you have answered both those letters I sent you. I would like to have answered this one, and tell them a thing or two, but you advised me not to. So let me know at once on the above."

With the above letter Mrs. Painter inclosed the following letter of February 15, 1924, from Nohl to her:

"We are in receipt of a letter from Frank L. Hume of Chicago in which he says:

" 'Mrs. Painter and Mr. Oberheide came to an adjustment of their affairs, and that is why I represent her in the matter of obtaining an assignment of the judgment which was rendered in favor of the Merchants & Manufacturers Bank against Oberheide.'

"If you understand that this adjustment to which Mr. Hume refers in any way affects the status of the judgment of the Merchants & Manufacturers Bank v.

C. H. Oberheide, we wish you would let us know immediately.

"If you will send us a check for $1500.00 to cover our fees and disbursements, we will get the bank to waive its claim against you of approximately $1,000.00 and will procure for you an assignment of the judgment.

"If the adjustment with Mr. Hume in the Oberheide matter is an attempt to evade responsibility in the matter of your agreement with the bank for attorneys' fees and disbursements and the amount still owing the bank, we shall proceed to collect the judgment against Mr. Oberheide, and if that fails because of any agreement that you have made with Mr. Oberheide, we shall be obliged to look to you for the payment of these sums referred to.

"We utterly fail to understand how you could have made any such adjustment with Mr. Oberheide in the light of what you recently told the writer in our office. We sincerely trust that you fully realize your responsibilities in this matter."

February 19, 1924, this letter was written by Mrs. Painter to C. H. Oberheide:

"Your letter with letter enclosed to copy and write to that attorney Nohl, Nohl & Petrie. Of all the treatment and hold up games I never heard of anything like it. I will do only as you tell me and will write nothing more than what you dictated and all letters I will forward to you. I am with you on all and will stand by you through the end and know you will likewise. . . ."

March 6, 1924, Mr. Hume received the following letter from Mrs. Painter:

". . . I trust Mrs. Oberheide will improve in her condition and gain her strength quickly. Am indeed sorry for her having to go through all this ordeal at her age in life.

"I am very anxious now to get all my matter fixed up, so I'll know where I am at, which same should

make it more satisfactory, also peace of mind all around.

"I will keep in touch with you and will arrange to come down again in two weeks or so. Will bring all the papers, giving you a chance to go over all that bank matter, also the other papers, also will give myself time enough not to hurry things through so to get everything straightened up this coming trip.

"I certainly have appreciated the courtesy, also the interest you have in trying to assist me in getting this matter all adjusted. When same is all completed I certainly want to do the right thing in fixing up my part with you."

The following is a portion of a letter written by Nohl to Hume, March 14, 1924:

"Mr. John Vennema has forwarded to us for attention your letter of March 12 addressed to him relative to the judgment of the Merchants & Manufacturers Bank v. C. H. Oberheide. We wrote you on February 15, that 'if Mrs. Painter desires to have an assignment of this judgment, she will of course, have to discharge the obligations which have been incurred for disbursements and attorney fees, amounting to 40% of the amount collectible on the judgment less the amount of said disbursements, in addition to the indebtedness to the Merchants & Manufacturers Bank in the sum of approximately $1,000.00.' We have advised Mrs. Painter that we would settle the claim for attorney fees and her additional indebtedness to the bank for $1500.00. If such a settlement is made, the Merchants & Manufacturers Bank will give her an assignment of the judgment."

May 21, 1924, Mrs. Painter forwarded a letter to Mr. Hume as follows:

"Your letter of May 12th at hand regarding the matter I wrote you. Pleased you have fixed it—and did you get the notes from Mr. Myer? If so, will you kind-

ly return them to me on my next trip? I must insist upon their getting down to business with me to try and fix up our matter so I really will know where I am at, as I really cannot rely on his promises. . . ."

Unsuccessful in his efforts to get the bank to assign the Oberheide judgment to her, Mr. Hume as attorney for Mrs. Painter filed a bill of complaint December 4, 1924, against the Merchants Bank and John Vennema, its Chicago attorney, seeking to restrain them from taking further steps to enforce the judgment against C. H. Oberheide and the Oberheide property, and to order the bank to assign to Mrs. Painter the judgment and the certificate of sale theretofore issued. This bill was signed and sworn to by Mrs. Painter November 20, 1924. Mr. Vennema filed a disclaimer. December 4, 1924, Mr. Hume also filed a bill for Dora Oberheide, alleging the facts with reference to the Oberheide judgment, sheriff's sale, a prior release by Mrs. Painter of the lien of the judgment against the property, the title to which was in Dora Oberheide, and sought to have the certificate of sale declared null and void as a cloud upon her title.

May 17, 1925, another bill was filed by Dora Oberheide, in all respects the same as her bill of December 4, 1924, except that it was directed to unknown owners of the certificate of sale of C. H. Oberheide's 1/9 interest in the Oberheide property.

On Dora Oberheide's bill of complaint of December 4, 1924, a decree *pro confesso* was entered February 19, 1925, declaring the certificate of sale theretofore delivered by the sheriff to the Merchants Bank null and void and a cloud upon her title. February 16, 1926, it was ordered that the Merchants Bank be allowed to appear and file its answer, the decree *pro confesso* to stand confirmed until the further order of the court. Many additional pleadings were filed in the three above mentioned causes, but no hearing was had

on any of them prior to May 5, 1926, when Mrs. Painter came to Chicago from her home in Davenport, Iowa, after hearing that C. H. Oberheide, with whom she had been on quite friendly terms, had married. She was greatly incensed and said that she needed money and was going to make him pay her what he owed her. After a discussion of her affairs with Oberheide in Mr. Hume's office, either she or Oberheide requested Mr. Hume to ascertain what Dora Oberheide would pay Mrs. Painter for her claim against the Merchants Bank for the Oberheide judgment. Mr. Hume telephoned one of Dora Oberheide's daughters, who advised, after conferring with her mother, that plaintiff would pay $2,500 for the assignment of Mrs. Painter's claim to the judgment, which offer Mrs. Painter agreed to accept.

Mrs. Painter returned to her home in Davenport and came back to Chicago May 16, 1926, when, after consulting with her attorney in Davenport, she executed a formal transfer of her claim against the Merchants Bank for the assignment of the C. H. Oberheide judgment, and as consideration therefor received notes of the Oberheide Coal Company, one for $500 and two for $1,000 each. She received payment of the first two notes and later refused payment of the third when proffered. Mrs. Painter's verified assignment to Dora Oberheide was substantially as follows:

"That C. H. Oberheide about May 15, 1913, gave his promissory note to Eva B. Painter for the sum of $2,500.00; that Eva B. Painter placed the note with the Merchants & Manufacturers Bank of Milwaukee as collateral security for a loan made to her by said bank; that the said loan and all the indebtedness from her to the bank was paid about August, 1921; . . . that the bank did not turn over to her the said note or the judgment into which said note had been merged in the Circuit Court of the County of Milwaukee, Wisconsin,

about August, 1919, which judgment was afterwards merged in a judgment rendered by the Circuit Court of Cook County, Illinois, in the case of Merchants & Manufacturers Bank v. C. H. Oberheide; that on March 5, 1926, Eva B. Painter agreed to sell, assign and transfer said judgment and all proceeds thereof to Dora Oberheide for $2,500.00, payable by notes to be given by the Oberheide Coal Company for $500.00, due ninety days, $1,000 due one year after date, $1,000 due two years after date; and that said Eva B. Painter has never assigned said judgment and is still the owner. In consideration of the aforesaid notes said Eva B. Painter assigns, sets over and transfers said judgment and all the proceeds thereof to Dora Oberheide and any and all claims she has or may have against said bank concerning same.'' Pursuant to this assignment an order was entered June 7, 1926, substituting Dora Oberheide for Eva B. Painter as complainant in the cause instituted by Mrs. Painter December 4, 1924.

By reason of the multiplicity and character of the pleadings filed in the three causes then pending, the circuit court ordered the consolidation of same January 17, 1927, allowing plaintiff to file an amended and engrossed bill of complaint within 20 days, defendants to plead, answer or demur within 20 days, defendants to file a cross-bill within 40 days, and that plaintiff plead, answer or demur to such cross-bill within 20 days thereafter.

In her amended and engrossed bill of complaint, after alleging substantially the facts heretofore set forth, Dora Oberheide prayed that the Merchants Bank and Leo F. Nohl, defendants, be required to convey to her the property conveyed to Nohl by the sheriff's deed.

In their answer to the engrossed bill of complaint the Merchants Bank and Leo F. Nohl, after denying some and admitting other allegations of the bill, de-

nied that Mrs. Painter was the real or equitable owner of the judgment or had any interest therein, and further denied that she had any right, power or authority over the judgment or any part of it, and alleged that it required no authority from her for the issuance of the execution or the holding of the sale. They further alleged that Mrs. Painter had no right, title or interest in or to the judgment or the proceeds thereof, or any claims against defendants, and that any assignment made by her was null and void and that by such assignment Mrs. Painter did not assign anything to plaintiff.

Leo F. Nohl filed a cross-bill alleging his 1/9 interest in the property involved by reason of the sheriff's deed to him of C. H. Oberheide's 1/9 interest in same; and that shortly prior to the delivery of the sheriff's deed to Nohl, the sheriff's certificate of sale of Oberheide's 1/9 interest in the property had been assigned to him by the Merchants Bank, which had purchased such interest at the execution sale for $2,500. The cross-bill concludes with a prayer for the appointment of a receiver, an accounting and partition of the Oberheide property. Dora Oberheide's answer denied Nohl's right to the relief prayed.

July 22, 1927, Mrs. Painter, who had not been a party to this proceeding since June 7, 1926, which was shortly after she had assigned her interest in the Oberheide judgment to Dora Oberheide, signed and verified an intervening petition which was filed by Harry G. Hershenson, as her attorney, December 8, 1927. October 25, 1929, he filed an amended intervening petition in her behalf, which alleged *inter alia* that through concealment of material facts and the false and fraudulent representations of Mr. Hume, upon which she relied, she was induced to execute the assignment of her judgment against C. H. Oberheide to plaintiff without a full disclosure of all the facts pertaining to the matter; that she was still indebted to the Merchants Bank

in the sum of $1,000 and interest; that she had authorized the bank and Nohl to take the necessary steps to collect the Oberheide judgment; that the action brought by Hume in her behalf December 4, 1924, was without her knowledge and consent; and prayed that Dora Oberheide be ordered to transfer and reassign all right, title and interest in the judgment or the proceeds thereof and to any and all claims of Mrs. Painter against the Merchants Bank, which had been assigned by her to Dora Oberheide; that she be decreed to be the equitable owner of an undivided 1/9 interest in the real estate described in the bill of complaint, subject only to the right and interest, respectively, of the Merchants Bank and Nohl for the unpaid balance of her indebtedness of $1,000 to the bank, costs, expenses and attorney's fees; and that Nohl be decreed to hold the title of the real estate for her use and benefit, subject only as aforesaid.

The hearings before the master commenced May 6, 1927, and continued intermittently until April 10, 1930.

Mr. Hume had represented Dora Oberheide and C. H. Oberheide before he was retained as solicitor by Mrs. Painter to secure the assignment to her from the Merchants Bank of the Oberheide judgment. He continued to represent Dora Oberheide and C. H. Oberheide as counsel during the period he represented Mrs. Painter, and he continued to represent Dora Oberheide after he ceased to represent Mrs. Painter, March 16, 1926. He withdrew as solicitor for Dora Oberheide October 10, 1928, at which time Mr. John L. Fogle became her solicitor. From shortly after the inception of this litigation to the present time Mr. Hershenson has been the solicitor for the Merchants Bank and its officer and attorney, Leo F. Nohl. Mr. Hershenson represented Mrs. Painter, at least since July 22, 1927, when he prepared her intervening petition (not filed until December 8, 1927), after seeing her in Davenport, Iowa,

where she lived, until December 20, 1929, when he withdrew as her solicitor, advising the master that he had just learned that her interests were in conflict with those of the bank and Nohl.

The first question presented for our determination on this appeal is whether the Merchants Bank or its officer and attorney, Leo F. Nohl, had any interest in or right or authority to deal with or control the judgment on the Oberheide collateral note in any manner except to transfer and assign same to Mrs. Painter after the Merchants Bank had sold and assigned her principal $5,000 note and its interest in the mortgage securing same to the trustees of the First National Bank, ostensibly for $4,000. Mr. Walter F. Myers, president of the bank, testified that he sold the principal note subsequent to the foreclosure judgment on the mortgage, but prior to the foreclosure sale. A short time after the sheriff's report of the foreclosure sale was confirmed by the circuit court at Milwaukee, her $5,000 principal note was returned to Mrs. Painter as fully paid. Under what theory can this bank justify its claim to an unpaid balance of $1,000 due on this note? Shortly after its receipt of the $4,000, it is admitted that its books showed that the $5,000 note was fully paid, but that she was charged with $125 for the costs and attorney's fees incident to securing the judgments against Oberheide in Milwaukee and Chicago. In answer to her demand that he transfer and assign the judgment to her, Mr. Myers, president of the Merchants Bank, wrote Mrs. Painter May 22, 1922, advising her that the bank would assign the judgment to her upon her payment of the $125 heretofore mentioned, and that he might possibly persuade the board of directors to make the assignment for $100. Nohl, in his letter of February 14, 1924, to Mrs. Painter made no reference to any claim of the bank for $1,000, but simply asserted that Mrs. Painter had agreed to a 40-60 split of the proceeds of the judgment between

them. Yet the master found and the court decreed that this bank had a lawful claim to this judgment and its proceeds to the extent of an unpaid balance of $1,000 on the principal indebtedness in spite of the fact that the bank's records showed originally that her note for $5,000 had been paid, and in spite of the further fact that the president of the bank admitted in writing May 22, 1922, that she owed the bank nothing on the principal note. If the bank had no claim, upon what basis was Nohl justified in advancing a claim for $1,680? Later, it is true, Nohl advanced a claim in behalf of the bank, but we fail to see in either exorbitant claim anything except a deliberate attempt to take advantage of Mrs. Painter.

But a careful inspection of the record reveals facts even more significant on this phase of the case. The Merchants Bank was a party to the foreclosure of the mortgage, which was held by the Trust Company to secure the principal notes of Mrs. Painter held by both banks. Mr. Myers, president of the Merchants Bank, testified that he sold and assigned the $5,000 principal note of the Merchants Bank to the trustees of the First National Bank subsequent to the foreclosure judgment, but prior to the foreclosure sale. He sold the note July 20, 1921. The record discloses that the sheriff's report of the sale was confirmed by an order of the circuit court at Milwaukee, August 6, 1921, which order contained a finding that said report of the sale had been presented and filed in that court July 19, 1921, just a day before Mr. Myers sold the $5,000 note and his bank's interest in the mortgage and foreclosure judgment. It is fair to assume that the sale must have been held on a day undisclosed by the record, but prior to July 19, 1921. The record also discloses that the foreclosure sale realized more than sufficient to pay all of the principal notes in full, together with accrued interest thereon and costs and solicitor's fees, leaving a substantial surplus, which was remitted to Mrs.

Painter, the mortgagor. It is difficult to understand why this bank sold its $5,000 note for 80 per cent of its value after the sale of the foreclosed property for an amount that was amply sufficient to insure payment in full of its note with accrued interest.

We are impelled to conclude from the admission of president Myers, the records of the bank, first showing a credit of $5,000 on her principal note and then disclosing an admitted erasure and substitution of entries, and the return of the note to Mrs. Painter as having been paid, that her principal note of $5,000 to the Merchants Bank was paid and that there was no unpaid balance on that note upon which any claim of interest in the judgment on the Oberheide collateral note might be lawfully predicated.

It is urged that, even though there was no legal or equitable basis for the allowance in the decree of the bank's claim of $1,000 and Nohl's claim for 40 per cent of the remainder of the proceeds of the judgment as and for his solicitor's fees, costs and expenses, the bank's claim for $125 for costs and attorney's fees in securing the Oberheide judgments was sufficient justification for withholding the assignment of the judgment to Mrs. Painter and proceeding to collect it to protect its claim for $125. We see no merit in this contention.

It is true that the only possible interest that the bank could have in the Oberheide judgments was its advancement of $125 for costs and attorney's fees in securing those judgments, but this interest, even though valid in its inception, was waived when no claim was made for it at the time the principal note was sold, and the indebtedness, for which the Oberheide note was given as collateral security, was completely discharged. The collateral followed the principal note, the payment of the principal note in full releasing the collateral, and the pledgor was entitled to the return of her pledge. When the principal note was sold it was the duty of the bank to advance its claim then, if it so desired, for the

payment of the $125 it had expended in reducing the Oberheide collateral note to judgment. At that time there were sufficient funds in the hands of the sheriff as a result of the foreclosure sale to pay the claim.

The law is well settled that the general property or title to the property pledged remains in the pledgor, subject to the rights of the pledgee, until the pledge is foreclosed in accordance with the terms of the pledge agreement or the debt is discharged. In any event the claim against Mrs. Painter for $125 is for an entirely different indebtedness than the principal indebtedness for which the collateral note was given.

The generally recognized principles of law applicable to pledges, where the secured principal debt is sold, transferred or assigned by the pledgee, are clearly enunciated in 49 C. J., page 964, section 158:

"The pledgee's transfer of the secured debt ordinarily carries with it a transfer of the collateral, unless the parties agree otherwise. The pledge being regarded as collateral to the principal obligation, upon an assignment of the latter without the pledge, the assignor will hold the collateral as trustee for his assignee, even though the assignee takes a renewal of the principal obligation in his own name, and payments received by him on the collateral will be held for the use of the assignee. So where the pledgee assigns the debt to one person and the collateral to another, the latter will hold the collateral in trust for the assignee of the debt. But where it is the evident intention of the parties in the delivery of collateral that it shall be held for the personal security of the pledgee, upon an assignment by the pledgee of his debt, without the collateral, the latter becomes the property of the pledgor freed from the lien. If after the assignment of the principal debt without recourse the pledgee makes an exchange of collateral with the pledgor, the assignee may enforce the principal obligation against the pledgor, without returning or accounting for the collat-

eral, since in such case the pledgee is acting as trustee for the pledgor rather than for the assignee in holding the collateral."

The Merchants Bank was justified under the pledge agreement in securing the judgment in its own name because at that time Mrs. Painter was in default on her principal note and the collateral note was also in default, but upon payment of the principal note it had no longer either a legal or equitable interest in the Oberheide judgment, and upon its refusal to assign the judgment to Mrs. Painter it held the title to same and the proceeds thereof only as a trustee for her benefit. Under well recognized principles of law it could not abuse its trust nor could it take any advantage of its position as trustee detrimental to the interests of its beneficiary.

It was the bank's duty to immediately assign the Oberheide judgment to Mrs. Painter. It not only failed to do so, but ignored her repeated demands and imposed unreasonable and inequitable conditions for its assignment. The trustee is not allowed to put himself in a position in which to be honest must be a strain on him. (*Galbraith v. Tracy*, 153 Ill. 54.)

It will be noted that in his letter of May 22, 1922, to Mrs. Painter, Myers, president of the bank, made no claim for any unpaid balance of $1,000 due the bank on her $5,000 principal note, but stated that he would assign the judgment to her if she paid the $125 for costs and attorney's fees and might do so if she sent him $100; that in Nohl's letter of February 14, 1924, to Mrs. Painter no claim of the bank was asserted, but only his own claim for 40 per cent of the proceeds of the judgment or approximately $1,680; that on the very next day, February 15, 1924, Nohl in his letter to Mrs. Painter first mentioned the bank's claim for $1,000, but only casually, stating that if she paid him $1,500 for his fees and disbursements he could get the bank to waive its claim for $1,000; that February 15,

1924, Nohl wrote to Hume that to secure the assignment of the judgment Mrs. Painter would have to pay the bank $1,000 and would have to pay him 40 per cent of the amount collectible on the judgment; and that on March 14, 1924, Nohl wrote Hume that he had advised Mrs. Painter that he would settle his and the bank's claim for $1,500.

How did the bank perform the duties of its trusteeship in behalf of Mrs. Painter? After the admission in the bank president's letter to Mrs. Painter May 22, 1922, that her principal $5,000 note had been paid, and after the original entries in the bank's records showed its payment, subsequent juggling of entries in the same records pretended to show an unpaid balance of $1,000 on the principal note. While the original claim of the bank was only for costs and attorney's fees of $125, Mr. Myers, president of the bank, and Mr. Nohl proceeded to present unconscionable claims.

We are mindful of the fact that, when president Myers of the Merchants Bank demanded $125 costs and attorney's fees from Mrs. Painter in his letter of May 22, 1922, as a condition precedent to assigning the Oberheide judgment to her, that amount represented the total expenditures of the bank and attorney's fees for securing both the Milwaukee and Chicago judgments and the issuance of the original execution, which was returned "no part satisfied."

From October 20, 1920, when the sheriff of Cook county returned the original execution on the Oberheide judgment, the judgment lay dormant until December, 1923, when Mr. Vennema, the then Chicago attorney for the bank, learning that Christ Oberheide died intestate, March 11, 1923, and that C. H. Oberheide, his son, the judgment debtor, became vested with a 1/9 interest in his father's estate, which was conveyed with all the other interests in the estate to plaintiff March 24, 1923, wrote letters to plaintiff and her attorney, Mr. Hume, threatening that if the judg-

ment was not paid a levy would be made. It is conceded that, although C. H. Oberheide's 1/9 interest in his father's real estate was acquired after entry of the judgment and thereafter conveyed to plaintiff, it was subject to levy and sale on an execution issued on the judgment.

The conclusion is inescapable that the Merchants Bank had no valid claim for $1,000 or any other amount, or any interest in the Oberheide judgment after July 20, 1921, when it sold the principal note. Leo F. Nohl had no lawful claim for attorney fees or other expenses in connection with the judgment since the date the principal note was sold. The bank and later Nohl, after the assignment of the certificate of sale to him by the bank, the president of which had apparently become squeamish about holding the certificate which had been delivered to him by the sheriff after the execution sale on the judgment which the record conclusively demonstrates the bank had no interest in, could only hold title as trustee for Mrs. Painter or her assignee. It is clear to us that neither Nohl nor the bank had any legal or equitable claim to or interest in the judgment, the certificate of sale or the sheriff's deed.

As heretofore stated Mr. Hershenson represented the Merchants Bank and Leo F. Nohl in this litigation. Mrs. Painter had not been a party to the proceeding since shortly after the assignment of the Oberheide judgment and its proceeds by her to plaintiff March 16, 1926. Shortly after the master's hearings began May 6, 1927, the record discloses that Mr. Hershenson visited Davenport, Iowa, and after interviewing Mrs. Painter there, returned to Chicago as her solicitor. The record does not disclose the motives that actuated her, the influences that prompted her or the promises, if any, made to her to get her consent to again become a party to the cause, primarily, as the record indicates, for the benefit of the bank and Nohl. In any event we find her back in the case as an ally of Nohl and the

bank, against whom she had previously waged a militant contest for her rights for nearly six years. Mr. Hershenson prepared and she signed a verified intervening petition in the consolidated causes July 22, 1927, which he did not file until December 8, 1927, and which contained the allegations heretofore set forth. The intervening petition and her amended petition filed sometime later were obviously drawn to serve the interests and purposes of the Merchants Bank and Nohl. Her evidence before the master was calculated to serve the same purposes and interests. Thus we find the bank and Nohl using this woman, whose rights they had consistently and persistently flaunted for nearly six years, as a smoke screen in their plan or scheme to secure the major portion of the proceeds of the Oberheide judgment.

Mrs. Painter's evidence at the master's hearing was refuted in its entirety by the evidence of credible witnesses and by documentary evidence consisting of her own and other letters and numerous other written instruments. After a careful examination of the record presented in this case and deliberate consideration of her conduct and testimony, we cannot avoid the conclusion that such conduct and testimony had either been inspired by some ulterior motive on her part, or that somebody had suborned her to commit perjury. Her attempt to testify in such a manner as to advance the unjustifiable and inequitable claims of Nohl and the bank resulted in complete and abject failure.

Because of Mrs. Painter's testimony that she owed the bank $1,000, which fact she had strenuously denied for almost six years, and her further testimony that she had agreed to pay Nohl for attorney's fees 40 per cent of the amount collected on the judgment, when she had disputed for nearly six years his right to any attorney's fees, and her testimony that she had authorized Nohl to collect the judgment, when for the same length of time she had asserted that he had no such right, the

bank and Nohl urge, in effect, that it matters not what they did with the Oberheide judgment or how they did it. The main reliance of Nohl and the bank on the hearing before the master and the chancellor is that the unbelievable testimony of Mrs. Painter, regardless of how spurious their claims were and are, saved the day for them, and on this appeal affords them a mantle of protection.

It is our opinion that Mrs. Painter, if she was in possession of all of her mental faculties when she testified before the master, wilfully and knowingly swore falsely and that her testimony is entirely unworthy of belief. If a witness, whether plaintiff, defendant or otherwise, is shown by proofs to have wilfully and knowingly sworn falsely on any material matter, his or her evidence may be rejected in so far as it has not been corroborated by other credible evidence. (*Gulliher v. People,* 82 Ill. 145.) There was no corroboration of any of her material testimony and it should have been entirely disregarded.

It appears that almost immediately after her property was sold by the sheriff at Milwaukee in July, 1921, to satisfy the foreclosure judgment on the principal note of the Merchants Bank for $5,000, as well as the other notes involved, she demanded the assignment to her of the judgments entered on the Oberheide collateral note, both in Milwaukee and in Chicago. She carried on a single-handed fight from 1921 until February, 1924, for the transfer of the judgment to her, without avail. February, 1924, accompanied by C. H. Oberheide, the judgment debtor, whom she had known for 15 years or more, she went to Mr. Hume's office and, after relating the history and facts of her controversy with the bank, stated her opinion that she was entitled to the assignment of the judgment. Mr. Hume advised her that it was his opinion that the bank was unlawfully withholding the Oberheide judgment from her. She retained him, in writing, as her attorney, Febru-

ary 5, 1924, for the purpose of getting the Oberheide note back and securing an assignment of the judgment on the note from the bank. Her relations with C. B. Oberheide at that time were amicable and she solicited his aid for the same purpose. Mr. Hume was not employed to collect the judgment for Mrs. Painter, but only to compel the bank to assign it to her.

Did Mrs. Painter, for three years prior to and for more than two years subsequent to her employment of Mr. Hume as her attorney, ever concede or admit that she was indebted to the bank for a balance of $1,000 on her $5,000 principal note? She did not according to the competent evidence in the record.

Did she at any time during the nearly six years that transpired between the sale of her principal note by the bank and her conference with Mr. Hershenson ever write, state or admit that she had authorized either the bank or Nohl to collect the Oberheide judgment for her? She did not.

Did she ever, during these years, admit or concede that she had agreed to or acquiesced in Nohl's receiving 40 per cent of the amount collected on the Oberheide judgment? She did not.

After she had sold and assigned her interest in the judgment and the proceeds thereof and in any and all of her claims against the bank incident thereto to Dora Oberheide for $2,500, March 16, 1926, did she not abide peacefully by that transaction until Mr. Hershenson, the solicitor for the bank and Nohl, appeared on the scene in Davenport, Iowa, and had a conference with her while the hearing on this proceeding was in progress before the master? She did.

Did she not accept $1,500 of the purchase price of the assignment of the Oberheide judgment before Hershenson saw her and refuse to accept the final $1,000 payment after he saw her? She did.

What inducements were offered, what promises were made to her or what legerdemain was practiced on

Mrs. Painter to bring about a complete change of front on her part in the effort to save the faces of the bank and Nohl in this proceeding will probably never be known because the moving actors in the plot will certainly never divulge them and Mrs. Painter has passed to the great beyond.

Various letters and other written documents heretofore set forth reflected Mrs. Painter's attitude on her right to the assignment of the judgment to her and on the presumption of the bank in asserting a claim for any unpaid balance on her principal note, as well as her indignation at Nohl's assuming to represent her and charge her exorbitant fees in the matter of the collection of the Oberheide judgment.

March 11, 1924, Mrs. Painter, reiterating her denial that the bank had any lawful claim against her for $1,000 or any other amount, and, asserting that Nohl had no lawful claim against her for attorney's fees, executed the following verified written statement as to the status of her relations with the bank and Mr. Nohl at that time:

"State of Illinois⎱ss
 County of Cook ⎰

"EVA B. PAINTER, being first duly sworn on oath, says that years ago she obtained a loan on the Merchants & Manufacturers Bank of Milwaukee, Wisconsin, and placed with the bank as collateral security for the payment of said loan a note made by C. H. Oberheide, of Chicago, Illinois; that the said bank in its name obtained at Milwaukee, Wisconsin, a judgment against the said C. H. Oberheide on said note made by him, and afterwards, in the Superior Court of Cook County, Illinois, obtained a judgment against the said C. H. Oberheide on the judgment that was rendered at Milwaukee; that affiant paid all of her indebtedness to the said bank in said loan matter, or any other matters, and at the time of said payment the said bank should

have assigned to affiant said judgment or judgments; that affiant never authorized the bank to obtain said judgment, and never authorized Messrs. Nohl, Nohl & Petrie, of Milwaukee, Wisconsin, or John Vennema of Chicago, who are attorneys claiming to represent said bank, to make collection on said judgment or judgments; that about February 1st, 1924, she told the said John Vennema that he should do nothing towards the collection of said judgment, and on February 13, 1924, wrote a letter to said Nohl, Nohl & Petrie stating that said Oberheide judgment should be assigned to her and that she wanted nothing further done, and wanted said judgment assigned to her.

(signed) Eva B. Painter

Subscribed and sworn to before me
this 11th day of March, 1924.
(signed) Anna Frintz
Notary Public.''

In contrast to and in contradiction of the numerous letters in her own handwriting and pleadings and written statements signed and verified by her, the unreliability of Mrs. Painter's testimony is evinced by the following portion of her examination before the master:

''Q. At the end of that foreclosure suit what did you owe to the Merchants & Manufacturers Bank of Milwaukee, if anything? A. I owed them $1,000.

''Q. Well, can you say how that $1,000.00 was made up? A. I just can't recall it unless the two banks—the Merchants & Manufacturers Bank took over the claim from the First National Bank in some way, so I just can't recall it.

''Q. How do you know you owe them $1,000? A. Because it was—we looked it over.

''Q. You looked what over? A. These different papers and found out.

''Q. What papers? A. Of the bank.

"Q. Where? A. Milwaukee.

"Q. When? A. When I was up there one time.

"Q. Well, when was that? A. I can't just recall the date.

"Q. Give me an approximate idea. A. I haven't any idea just now.

"Q. Was it this year? A. No.

"Q. Was it last year? A. Possibly.

"Q. Possibly? A. Yes.

"Q. What date last year, about? A. I can't recall it. I have been up at Milwaukee various times, and I can't remember the date.

"Q. I am speaking of your conversation with Mr. Myers. A. Yes.

"Q. What date last year? A. I don't recall it.

"Q. State what was said. A. I just don't recall what was said but I know it was $1,000.

"Q. I am asking you what was said. A. How is that?

"Q. And you can't remember a word that was said? A. I just can't recall it.

"Q. Then how do you know that the amount wasn't $100.00 or $500.00 or $10,000? A. I know that $10,000 —There were papers that he claimed we still owed the bank $1,000. I do not recall what the documents were. The conversation was in Milwaukee at Mr. Myers' office in the bank. No one was present. I paid the $10,500 when the foreclosure was made of my property. The foreclosure that was mentioned in this proceeding. That is when the notes came back to me and that is when everything was settled on those notes and at that time I owed them $1,000. I never owed Mr. Myers $100.00. The attorney's fees on that note that they took judgment on for Mr. Oberheide, I claimed I wouldn't pay the attorney's fees. I never owed Mr. Myers anything outside of that and I claimed I wouldn't pay that. I didn't owe Mr. Myers anything

on my note, that is, I owed $100.00 or $115.00—I don't know just what the attorney's fees were. ' . . . There was $1,000 still owing the bank. I just can't recall what Mr. Myers said to me. I got back the $10,550 worth of notes.

"Q. Were there any other notes out? A. Must be that $1,000.

"Q. Do you know whether there was a $1,000 note out or not? A. There is $1,000.

"Q. Do you know? A. I know that we still owe the bank $1,000.

"Q. How do you know it? A. Because it was explained to me by Mr. Myers.

"Q. Did he hold a note for it did he say? A. We didn't talk of that.

"Q. Then you do not know at all how it was? A. Yes. The First National Bank—the Manufacturers & Merchants Bank took over the indebtedness of C. H. Oberheide's paper over to the Merchants & Manufacturers Bank and that is where the $1,000—it was figured out in that way—where the $1,000.00 was still owing the two banks, that $1,000, because they took over that claim.

"Q. Do you know of your own knowledge that the Merchants and Manufacturers Bank took any paper over from the other Bank? A. I do not know anything about any of this stuff, it has been so far back, and I have had so much trouble. I didn't give it a thought any more."

The documentary evidence alone in this case absolutely determined the falsity of Mrs. Painter's testimony before the master.

It is next contended that the assignment from Mrs. Painter to Dora Oberheide of the Oberheide judgment and the proceeds thereof was null and void because Mr. Hume, her attorney, represented conflicting, adverse interests in the cause, and because he procured Mrs.

Painter to make the assignment to Dora Oberheide through false representations and the concealment of material facts.

There is no merit in this contention. Mr. Hume was engaged by Mrs. Painter to compel the bank to return the Oberheide $2,500 note and to assign the Oberheide judgment on that note to her. The record discloses that he worked diligently and conscientiously to accomplish the object for which he had been retained, and while he represented the Oberheides before, at and after the time that he represented Mrs. Painter, we fail to see that he represented conflicting interests. In fact, during the time that he represented Mrs. Painter, she and the Oberheides were in full accord, and they were all engaged in a common, mutual undertaking to compel the bank to assign the Oberheide judgment to her. It is charged that Mr. Hume misrepresented and concealed facts from Mrs. Painter at the time she executed the assignment of the judgment to Dora Oberheide for a consideration of $2,500. She did not sell a judgment in hand to Dora Oberheide, but a judgment in litigation, and it appears to us that she received a munificent price for it compared to what the bank and Nohl, with whom she later became allied, offered her as her share of the proceeds of the judgment.

In 1924 the bank and Nohl were so solicitous about her interests and so magnanimous to her that they proposed that after the bank received $1,000, to which it had no valid claim, and after Nohl got 40 per cent or about $1,680, to which he had no semblance of a lawful claim, she might have the balance, which, with interest, at that time amounted to seven or eight hundred dollars. Mrs. Painter and Dora Oberheide and her children had been friends for years. Competent evidence in the record proves that Mrs. Painter and the Oberheides worked out the terms of the assignment without Mr.

Hume's assistance, and that Mrs. Painter was neither urged nor persuaded by Mr. Hume to agree to it. The only part the record shows that Mr. Hume played in the transaction was that, at the request of Mrs. Painter or C. H. Oberheide or both, he telephoned a daughter of Dora Oberheide to ascertain what her mother would pay for the assignment. Mr. Hume reported to Mrs. Painter that Dora Oberheide would pay $2,500, and she agreed to accept that amount. She had from March 5, 1926, until March 16, 1926, when the formal written assignment was drawn by Mr. Hume and executed by Mrs. Painter, to consider and deliberate on the advisability of going through with her agreement, and it appeared that she also requested the advice of her Davenport lawyer as to the advisability of making the assignment.

That she was satisfied with her bargain is attested by the fact that she accepted payment of $1,500 of the $2,500 due her and made no complaint of the transaction until more than a year later when, it is apparent, some influence was brought to bear upon her to repudiate the assignment. The position of an attorney who acts for both parties, to the knowledge of each, in the preparation of papers needed to effect their purpose, and gives to each the advice necessary for their protection, is recognized by law as a proper one. (*Taylor v. Vail*, 80 Vt. 152, 66 Atl. 820.)

There is abundant evidence in the record to show that she was not a victim of false representation or concealment of facts by Mr. Hume, and we are constrained to believe that she knew exactly what she was selling, and that the consideration was fair and equitable when she made the assignment of the judgment to Dora Oberheide.

Mr. Hume is criticized and castigated for withholding letters and papers that had been delivered to him by Mrs. Painter or that had come to his hands as her

attorney. In our opinion, Mr. Hume was justified in retaining the documents that pertained to the Oberheide judgment because they passed with the assignment of the judgment to her.

Then, when a vicious assault was made on Mr. Hume's professional reputation and integrity by Mrs. Painter and those with whom she was then allied for the purpose of depriving Dora Oberheide of her rights, he was warranted in refusing to return, and in offering and introducing on the hearing before the master, the letters in Mrs. Painter's handwriting and other documents that clearly refuted her implications and charges, both as to himself and the assignment to Dora Oberheide. These letters and documents afforded a complete vindication of his professional standing and integrity. No authority has been cited holding that a client can with impunity attack an attorney, and the courts have uniformly protected attorneys from unjustifiable attacks of clients or former clients. It is not unusual for counsel to represent all of the parties to a suit, whose interests are mutual and amicable. (*Frew v. Richardson*, 97 Ill. App. 18.) Our Supreme Court, in discussing the duty of an attorney who represented both parties to a transaction, held in *Cooper & Moss v. Hamilton*, 52 Ill. 119, 122:

"Nor was it incompatible with Cooper's engagements with his client to draw the instrument, but still, in every particular, he was bound to protect her rights. He was, of course, bound in all things to make it conform to the agreement. But the terms having been first arranged, he could draw the instrument in conformity thereto, and look to appellee to pay him therefor, on either an express or an implied request. Whilst the position of Cooper was a delicate one, still it was not prohibited by his relation to Mrs. Hamilton. But, under such circumstances, an attorney must act with the utmost good faith towards his client."

In the instant case the evidence shows that the parties themselves arranged the terms of the agreement to assign the judgment to Dora Oberheide. Mr. Hume drew the instrument in conformity with their agreement. No imposition was practiced on Mrs. Painter. Hume profited nothing from the transaction, $75 being the entire amount received by him for legal services rendered Mrs. Painter, toward whom he at all times acted with the utmost good faith. Under the circumstances she received a fair and reasonable consideration for her judgment.

It is our opinion that, after a painstaking and exhaustive examination of the entire record in this case, Mr. Hume's professional integrity emerges unsullied and untainted.

The bank, Mr. Nohl and the successors of Mrs. Painter next contend that the assignment of the judgment and its proceeds by Mrs. Painter to Dora Oberheide conveyed no interest in the real estate which had theretofore been conveyed by the sheriff of Cook county by his deed to Leo F. Nohl, June 23, 1925. We find no merit in this contention.

Our Supreme Court, passing on a contention similar to that above stated, used the following language in *Mansfield v. Hoagland,* 52 Ill. 320, 322-324:

"It now appears that Joseph C. Hoagland on the 4th day of August, 1857, assigned the judgment to Andrew Hoagland, by an instrument in writing which was acknowledged before a notary public, in the city of New York. This assignment only professed to transfer the judgment, and makes no allusion to the certificate of purchase issued by the marshal to Joseph C. Hoagland . . . almost a year before the formal assignment of the judgment was made.

" . . . Suppose the entire judgment had been collected and in the hands of the attorney at the time, would any one have doubted that Andrew was entitled

to receive it? We presume not. And if so, why did not the certificate of purchase, in equity, pass to him by his assignment? As the intention was to transfer the judgment, and all the money recovered by it if collected, no reason is perceived why Andrew should not have the benefit of the certificate of purchase, as well as the balance of the judgment. When Joseph, therefore, wrote out the assignment on the certificate of purchase, he did no more than chancery would have compelled him to do. He was only carrying out the intention of himself and Andrew when the judgment was assigned.''

As the intention in the instant case was to transfer the judgment and all the money recovered by it, no reason is perceived why Dora Oberheide should not have the benefit of the certificate of sale as well. It logically follows that she should have the benefit of the sheriff's deed to Nohl, issued pursuant to and based on the certificate of sale.

We are of the opinion that it has been clearly established that subsequent to its sale of the principal indebtedness, July 20, 1921, the Merchants Bank held no more than the naked legal title to the Oberheide judgment as trustee for Mrs. Painter, who was the equitable owner thereof; that when the bank and Nohl successively held the certificate of sale they did so only as trustees for Mrs. Painter and her assignee; and that Nohl, having no equitable right to or interest in the real estate conveyed to him by the sheriff's deed, holds the legal title thereof as trustee for Dora Oberheide, the assignee of Mrs. Painter, the sole beneficial owner of the judgment, through which Nohl secured the sheriff's deed to the property involved.

It is almost inconceivable that this bank and Nohl should seek through a court of equity to protect their alleged interests in this property, which are palpably

grounded in fraud. The only claim that the bank could ever have legitimately asserted against the judgment on the Oberheide collateral note was to the extent of $125 for costs and attorney's fees expended in securing both judgments, and it has been shown that the Cook county judgment was no longer subject to a claim for even that amount after the principal indebtedness had been discharged. Upon the discharge of collateral by payment or other discharge of the principal obligation, the pledgor becomes the absolute owner of the collateral and entitled to its possession, freed from any right of the pledgee to hold it for any other debt than that for which it was pledged. (49 C. J., sec. 177, page 970.)

The competent evidence in the record clearly shows that Nohl never had even a semblance of a legitimate claim for attorney's fees against Mrs. Painter or to the Oberheide judgment. Yet the bank and Nohl continued to pyramid their claims until they reached the amazing total of more than $2,700, which were allowed by the master and the chancellor.

But Nohl and the bank say, "what of it? Nohl has the legal title to the property by reason of the sheriff's deed and both Nohl and the bank are owners of equitable interests in the real estate of which they cannot be divested or deprived, even though Mrs. Painter intended by her assignment to Dora Oberheide to vest her with her legal and equitable interests in the judgment and the proceeds thereof, as well as the use of every remedy, lien and security available to the assignor as the means of enforcing the judgment, and with all legal or equitable claims she had or might thereafter have against the bank." They say, in effect, to Dora Oberheide that so long as you didn't redeem during the redemption period provided by law, you are now estopped from asserting under your assign-

ment from Mrs. Painter any claim against our interests in the real estate.

It is a general rule of law that on a valid assignment of a judgment the assignee succeeds to all the rights, interests and authority of his assignor, including the debt or claim on which the judgment was based, and the assignee succeeds to all incidental collateral rights, remedies and advantages existing at the time of the assignment and then available to the judgment creditors. (34 C. J. sec. 999, page 651.)

First the bank held title to the judgment and thereafter the certificate of sale, and then Nohl as assignee of the bank held title to the certificate of sale, both as trustees for Mrs. Painter and her successors in interest. Mrs. Painter transferred her interest and title to the judgment and its proceeds and all her claims against the bank to plaintiff while this litigation was pending in the circuit court. Dora Oberheide could have redeemed the property for the same amount of money that she paid for the assignment, but it appears that out of a spirit of loyalty to Mrs. Painter, and a sense of justice and fair play, she chose to pay the $2,500 to Mrs. Painter and contest what appeared to her to be the fraudulent claims of Nohl and the bank.

Courts of equity function to prevent fraud and not to encourage it. It would be a perversion of every principle of equity to permit this bank and Nohl to profit to the extent of the major portion of the proceeds of the Oberheide judgment, against which it has been heretofore shown that they succeeded in boosting a claim of $125, legal in its inception, but invalid as far as the Oberheide judgment was concerned subsequent to July 20, 1921, to more than $2,700, which was allowed by the decree of the circuit court. There is no refuge in the law for a trustee who has enriched himself, or who has endeavored to enrich himself, unconscionably to the detriment of his beneficiary.

Other contentions have been urged and questions raised, but in the view we take of this litigation we deem it unnecessary to discuss them. We have carefully read and considered all of the cases cited, but feel that discussion of them would only serve to unduly lengthen this already long opinion.

The motion heretofore made by the successors of Eva B. Painter to strike from the files of this court certain portions of plaintiff's reply brief, which was reserved, is denied.

For the reasons indicated herein the decree of the circuit court is reversed and the cause remanded with directions to the chancellor to vacate that portion of the decree which declared the assignment of the Oberheide judgment by Mrs. Painter to Dora Oberheide null and void, and to order Dora Oberheide to pay the successors of Eva B. Painter such amount as remains unpaid on the assignment. The chancellor is further directed to enter an order declaring the certificate of sale of C. H. Oberheide's 1/9 interest in the property involved null and void and to order Leo F. Nohl, assignee of the certificate of sale from the Merchants and Manufacturers Bank of Milwaukee and the holder of the legal title to said 1/9 interest of C. H. Oberheide, to transfer and convey such legal title to Dora Oberheide.

*Reversed and remanded with directions.*

GRIDLEY, P. J., and SCANLAN, J., concur.